The next matter, number 221773, Nadia Shash et al. v. Biogen Inc. et al. At this time, would counsel for the appellants please introduce himself on the record to begin? Good morning, Your Honors. Robert Kreib from Molo Lampkin for the appellants. Nadia Shash and Amjad Khan. If the court would permit, I would request five minutes for rebuttal. You have three. Thank you. Your Honors, Biogen misled investors by purporting to explain away Study 301's failure while concealing facts that undercut its explanation. Biogen told investors that the reason Study 301 failed was that it had too many participants who enrolled early and therefore received a lower dose before Biogen increased the doses for carriers. Biogen told investors that all, all of its data was consistent with that explanation. But Biogen misleadingly concealed the fact that its Study 302 data completely refuted that analysis. Study 302 showed that higher dose carriers did worse than lower dose carriers and non-carriers did poorly across both studies. The district court dismissed this suit because it said that Biogen's statements were just opinions about clinical data. But the law is clear that whether a statement is a fact or an opinion, you cannot say one thing but then conceal facts that thoroughly refute that statement and render the mission misleading. That's what Biogen did here. Let me ask here, the Food and Drug Administration approves this. Isn't that like an intervening event that, you know? Not at all, Your Honor. The Food and Drug Administration ultimately granted accelerated approval. But the complaint alleges in detail that there was a compromised agency process at every turn of this process. It was brought about by the fact that Biogen already had certain allies in the agency and that there was an enormous difference while the statisticians, the folks at the FDA that were actually in charge of evaluating the adequacy of this statistical analysis, thoroughly disagreed with what those insiders were saying. And this is not just what's alleged in detail in the complaint, although it is. It's also what Congress found when it investigated this. It said that this was an approval process rife with irregularities. That is the heading of one of the major sections in the congressional report. So to say that at the pleading stage that somehow precludes us from even going ahead with this claim, that's just completely disregarding the standards that would apply in evaluating a motion to dismiss. Let me say, I've looked and I know you may be able to find one case, but there is no case where the FDA or any other agency approves something. And then you can still sue. So I don't know if you have anything to say about that. On the contrary, Your Honor. Schwenemann out of the Ninth Circuit was one of the cases cited throughout our briefs. That case was also one where the FDA ultimately approved the drug. That was one where during the approval process, the head of the company had said, all our drug trials, our clinical trials, our animal trials support approval. He concealed the fact that one of his trials, a rat study, did not support approval. And the Ninth Circuit held that that was grounds to allow that suit to go forward, even though the FDA had ultimately approved that drug. So if Your Honor thinks that there's some principle out there that says that once the FDA approves it, every bad thing you've done. Yeah, that's my question. Yeah, so that case is directly contrary to Your Honor's theory. Can you help me with something? In your briefing, this all data statement is a centerpiece of the briefing, correct? It's an important point, yes. It's not a centerpiece? If I'm allowed to have more than one centerpiece, then yes, that is one of them. Well, you could have more pieces. Okay, unless you're getting at my question, what are the statements that you are asking us on appeal to find to be misleading? Can you just list them? Sure. And how many are there? There's several, and I'll give you the greatest hits because there's so many. You know, right off the bat, the very first statement during the class period when Sandrock is announcing what came out of these results and explaining away why study 301 failed, he says, importantly, patients in the futility analysis were those who had enrolled early in the trials, and those early enrolling patients had a lower average exposure to the drug, in large part due to the two protocol amendments. So he is clearly stating there that the reason the first study failed was that they had increased the dosages. The first study had more people that were enrolled before those increases, and that's why that study failed, whereas the second one failed. So one way to understand it, and you tell me if this is a problem if we understood it this way. Read that statement again. So this is paragraph 171 of the complaint, and this is on the heels of discussing the fact that there had been these two studies, the one of which had failed, the other succeeded. And he says, importantly, patients included in the futility analysis were those who had enrolled early in the trials, and those early enrolling patients had a lower average exposure to aducanumab, in large part due to two protocol amendments that occurred sometime after the startup trials. Okay, so on a statement like that, parts of that statement, like in large part and all of that, will be relevant to the misleading-less inquiry, correct? Well, the misleading-less inquiry focuses on whether he's saying, expressing an opinion, but then holding back facts that render that opinion misleading. Correct, but in that analysis, things like in large part will matter, correct? Sure, but they don't preclude liability, because even if you say in large part, the statement can be misleading if you omit something that's so egregious and just cast it in question. Okay, but then we have to analyze whether those, what came out in that other study, suggests that in large part doesn't capture enough of the people in that study who did benefit from a dose. That's not quite right, Your Honor, because the statement he made about the study 301 data is true. I mean, the high-performing or the higher-dosed carriers in that study did achieve results comparable to study 302. The problem was that that couldn't have been the reason the study failed. He gave an explanation for why the study failed that couldn't be right, because when you try and apply that- Okay, so there's a whole set of arguments of that sort that you're making, correct? Yes, but they- And there's another set in which the all data seems to be the gravamen of the claim, and that seems to be potentially to implicate a different line of analysis that has its own potential benefits to the plaintiff, correct? I would describe the all data statement as just a particularly aggravated case of the other misstatements. So when you say that all our data supports this opinion, it just makes it that much more misleading when you consider the- I understand that, but if we didn't think it was misleading independent of that, and I understand that you think it is, that is its own potentially misleading statement when paired with other things, correct? Absolutely, Your Honor. Okay, so my question on that, that's why I call it a centerpiece. All right. Okay? That statement is never addressed as such by the district court. It certainly elided that statement, Your Honor, it did. I don't understand. Does that mean it was addressed? I don't recall that- Okay, so it was not- Right. I understand the district court never addressed that statement. Right. Was that statement raised to the district court in any of the filings below? I mean, sure. It's front and center in the complaint. It's- Like a centerpiece. No, it's given a lot of prominence. So this is paragraph 191. There's a section of the complaints- I understand it's in the complaint. In any of the papers in the argumentation to the district court, was that sentence highlighted? I- So the briefs below weren't in the appendix, and no preservation issue has been raised by FIJ. And so we would submit that it's been waived by the other side for not having raised that. I didn't ask that question. I asked, was that sentence identified as an independently misleading sentence in any of the filings beyond the complaint to the district court? My recollection is that it certainly would have been. I unfortunately do not have the briefs below because there was no- this preservation claim was never raised by FIJ. The thing that just stands out to me is it appears so prominently and understandably so in the briefing that it's a little surprising it's not referenced in the district court opinion unless below the argument was not focused on that statement. We have certainly given it a lot of prominence on appeal because we think it's our best example. But that's par for the course of appeals. You always sit through the record and give the most emphasis to your best arguments. And it's probably fair to say it was given more emphasis on appeal than it was in the district court. But I certainly don't think it's the case that it wasn't mentioned to the district court. And if that was the case, FIJ certainly would have said that. I mean, they're confident lawyers. And if there was some kind of waiver, they surely would have pointed it out, which they haven't. For that reason, the statements are misleading, Your Honor. I would like to address Sian. Now, let's bring on this point with respect to the all data statement. It does seem that if you have a statement saying that people who got a higher dose did better and then you have a statement saying all data supports that, that most directly implicates what you highlight from the study, suggesting there's some data indicating that getting a higher dose doesn't show that. Right? Should I think of that as a factual misstatement if I have in my mind the all data? Or is that an opinion, in your view, in which there simply was an omission of facts that would bear on the opinion? Because I can't tell which you're arguing of the two. Right. We think it's the same result either way. We haven't contested the district court's finding that even the all data statement was an opinion because I believe Sandrock said, I think all the data supports that. I see. And does that mean then that the only way you can win is through the omission route? Yeah. We're not disputing on appeal that these are statements of opinion that were misleading. And that's because the I think preface to it. For that one particular statement, that's why we didn't try and appeal the district court's characterization. I got it. Okay. Thank you. That's helpful. Right. On the Scienter point, the district court erred there too. There's several features of this case that in combination creates a strong inference of Scienter and at least as plausible as any competing inference. The first of them is the fact that Biogen abruptly changed its reporting practices for its clinical trial data as soon as that data threatened to derail its approval plans. And this is, again, something that Sandrock himself made clear because this came out in the context of an investor call. An investor, an analyst on that call asked for the specific subgroup carrier data that we're talking about on appeal. And Sandrock admitted. He said, you're right. I mean, typically we do present a lot of things, subgroups included in the past. You're right. We did do that. There's a time and a place for everything. And then he makes this strange comment, we have nothing to hide. And a jury could easily find that Sandrock was basically giving a pretextual explanation. He has no good reason for why Biogen suddenly changed course on these reporting practices. There's that one line Biogen mentions where he talks about the fact that this is going to be under regulatory review. But that was true before too. This drug has been under regulatory review since 2011 when they filed their new drug application. So Biogen has given no good explanation for why the fact that it was now closer to the later stages of regulatory review would be a reason to withhold this information from the public. It strongly suggests, and a jury could easily find this at least as plausible when combined with everything else, that Biogen was withholding the data because it knew it would refute its explanation. Beyond that, there is the Biogen's complicity in the FDA approval process, which is set out in the complaints and only corroborated and strengthened by this recent congressional report. This is all in the briefing, correct? Yes, Your Honor. Thank you. Thank you, Your Honor. Thank you, counsel. At this time, if counsel for the appellees would introduce herself on the record to begin. May it please the Court, Audra Soloway from Paul Weiss, on behalf of the dependents and appellees, and with me are my colleagues, Daniel Sinrake and Danielle Maryshow. This dispute, Your Honors, fundamentally centers on the interpretation of complex clinical trial data. In this case, Biogen and a majority of reviewers within the FDA interpreted the clinical trial evidence to be supportive of aducanumab's efficacy at high doses if given over a sufficient number of doses. And ADU was approved. How could you think that all data supported that? So we're talking about the seven words uttered by Dr. Sandrock right now, Your Honor? So I think we need to look at the actual quote from Dr. Sandrock that the plaintiffs have been pulling out in a snippet, which has taken on new importance in this appeal. It was raised in the district court, but it was, I think, largely relegated to footnotes in the district court. If we look at the statement that Dr. Sandrock actually made, what he said, when read in full context, he's talking about the three different pieces of the studies here. He talks about study 301, which was the failed study. He then talks about 302, which is the successful study. He talks about the subset of patients within 301 that performed like a subset of those same patients in 302. And then he says, with respect to eMERGE, you really need to get to the higher dose. And I think our data are all consistent with that. So what he's saying in that sentence is that in his view, his belief, I think, the data are consistent with the idea that if you don't get people to the higher dose, you don't see a treatment impact. He is not saying, taken in context, that there's no possible interpretation of the data that wouldn't support Biogen's interpretation. He's speaking in that paragraph, and it's in paragraph 191 of the complaint, the full site, about sort of the specific phenomenon that they've observed of this needing a higher dose in order to get treatment. But the question is the all data. How could all data support that? Because there's some data showing that people who took a higher dose did worse than people who took a lower dose. Is that wrong? I'm not sure that's quite right, Your Honor, but let's just take a step back. When he's saying I think our data are consistent with that. And he's referring to the prior paragraph where he's laid out three sets of data that the company has looked at. Is there a difference between I think all our data is consistent with that and I think our data is all consistent with that? I'm not going to nitpick between those two things. The key thing is all to me, and I just want to try to get an answer. If you say all data is consistent with that, how can that be not misleading if there is some data that shows you do better at a lower dose than at a higher dose? Well, Your Honor, I don't believe the data does show you do better at a lower dose than a higher dose. That's actually not pleaded in the complaint. So that theory is not actually. There's no data they have of people doing better who got the. Your Honor, I believe in both studies it was patients who got the higher dose who performed better. That's I don't believe. Every patient did better who got a higher dose. I can't speak. Your Honor, the data isn't broken down patient by patient. But across the studies, the conclusion was that patients who received 10 milligrams and received it a sufficient number of times in 302, they saw a clinical improvement in terms of reduced decline. And in 301, that same group of patients. So is your point that the phrase all data does not refer to the individual patient level? Is that the point? Well, it certainly doesn't in this paragraph. Yes, it's not what Dr. Sandrick is talking about. He's referring to three specific sets of data. If you look at that paragraph, he's talking about a failed study. And actually, let's just pause on that. The idea that this statement means there's no way to analyze the data that isn't supportive of our view is fundamentally undermined by the fact that Dr. Sandrick in the very same sentence is saying 301 was a failed study. It did not meet its end points. So it can't possibly be that you can interpret those seven words out of context to say all the data is, or in this case, I think our data are all consistent with that. We can't possibly take that snippet to mean there's no way to look at the data that's not supportive of Biogen's ultimate position. We have a failed study. We also had a futility analysis that was declared, as you'll recall, well before the beginning of the class period that said, we're going to stop these studies because we don't believe that we're going to achieve statistical significance. There's a lot of data out there that suggests that there may be an issue with these studies. So the notion that the plaintiffs now have taken these seven words out of context to say we assured investors that every piece of data and any way you could run the numbers is entirely consistent with our conclusion, that's not what these seven words mean in context. In some of our case law, if I recall, and this always strikes me as a bit of a subtle point, the question of whether something can be misleading and the question of whether the debatability of that bears on say enter comes up. Are you making that kind of argument with respect to this point or is your only argument that it's not misleading? No, we've made both arguments, Your Honor. I mean, on the see enter point, there's a lot to be said about this argument. One is that this was an extemporaneous comment that Dr. Sandrock made and he's making it in the context of walking through, as I mentioned, these various points that led him to say I think, right, and then he utters the seven words. The other point, so it's extemporaneous, is one problem. So just to, if I'm tracking, this is responsive to my question in the sense that even if one thought it met the test for misleading, it wouldn't necessarily matter, because given the context, it would be hard to say that statement was made with the say enter, given the context of that particular statement. We would have to know, and this complaint does not supply, what did Dr. Sandrock know before he made that statement? Who told it to him? Did he believe that it undermined the conclusions that he and others at Biogen had drawn about the ultimate takeaways? And then did he have some reason to mislead investors about that, that could be sufficient to satisfy the strict and rigorous standard in this circuit for pleading a strong inference approach? And just on that last point, if we thought there was, as to the last of the things you mentioned, Evans to think that he had a reason to do that, would he have said say enter if we thought it was a misleading statement? Well, I think if you have both falsity, Your Honor, and say enter, then you would need to move on to loss causation. No, I understand. I guess I'm asking, at the say enter stage, you listed a bunch of things we'd need to know to figure out say enter, the last of which you said is having a reason to do it. And I'm saying if there was some basis for thinking there was a reason to do it, is that enough combined with falsity or misleading to make it? I think it's a holistic analysis, Your Honor. Under the Supreme Court's authority on how you plead a strong inference of fraudulent intent, you would measure all of the different competing inferences. And here, I'll just jump right into say enter. I mean, there's no allegation here. Often we look at motive, Your Honor. There's no allegation here that the individual defendants responsible for making these statements had any motive. None of them sold stock. None of them are alleged to have personally profited from intending to deceive investors. In fact, the company bought back billions of dollars of its own stock during the class period, which this court has previously recognized as fundamentally inconsistent with intent to deceive. And then you have the problem that the complaint simply doesn't identify conflicting information that was shown to Dr. Sandrock or any of the other individual defendants that caused them not to believe their interpretations of the clinical trial evidence that they have put forward to the FDA as a basis for approval. And I'd actually like to get to that point because FDA approval under the accelerated approval pathway here is actually a very important fact because it demonstrates the reasonableness of Biogen's positions on the scientific evidence. Most of these cases come before, Your Honors, and the FDA has refused to approve the drug. And the question is, did the company mislead investors about the prospects for FDA approval or about the science or sometimes about the reactions the FDA has had at meetings to the information being presented? But here, the FDA ultimately did approve this drug based on the strength of the scientific evidence that Biogen is describing both to the FDA and to shareholders. I don't understand why that should matter if there's nonetheless a misrepresentation about the science. In other words, the FDA may think that exactly what you're arguing was meant is enough, that the studies in aggregate support going forward and show that high dosage is enough to go forward. But that would be very different than if, I mean, I think you can see it, if he said every single patient who got a higher dose did better than any patient who didn't get a higher dose. And various other really direct factual statements like that that were just inconsistent with the data. The fact that FDA approves can't insulate that from being misleading, correct? Well, if there had been factual misstatements made in this case, which is the case in most of the cases that the plaintiffs in this case have cited, this would be a different case. But here, the plaintiffs admit that every statement that they claim is false is an opinion statement because it's either statements like, I think or I believe, or it's interpretations of data that are homomorphous. And embedded in the opinion, even, you agree that if I think every single patient who takes it. Well, if that statement had been made and it wasn't, if it were factually false, this would be a different case. But the plaintiffs concede that all of the facts that are in the statements here, 302 was a successful study. 301 was a failed study. The subset of patients in 301 who received high dose ADU over a sufficient period of time did perform like that same set of patients in study 302. So there are no misrepresentations of fact in this case. There are opinions without any omission of fact because the thing that the plaintiffs in this case claim was omitted is conflicting interpretations of the evidence. Meaning a reviewer within the FDA looked at the same body of evidence and that reviewer said, I think this should be analyzed differently. And this, yes, Your Honor. Just help me with it. Like here's a specific statement. You tell me how to think about this. I think that what we have learned clearly is that dose is very important, but that if individuals do receive 10 milligrams per kilogram, then they do have an efficacious response. So tell me how to analyze that with respect to whether that's misleading. That is not alleged to be a false statement in this case, Your Honor. The plaintiffs do not dispute that the patients who received that high dose in 302 were the highest, were the patients who performed the best. And they also do not dispute that the patients who received high dose ADU over a period of time in 301 performed consistent with that subset within 302. That is not a fact in dispute. What the plaintiffs are claiming, and this gets to the argument that they've made about the subgroups and in some cases the sub-subgroups, what they're saying is there's a different way to look at the data. Let's not focus on what Biogen focused on. Let's look at some subgroup data or some sub-subgroup data. And Dr. Massey concluded when looking at that subgroup data, he thought it undermined the ultimate conclusion about whether the drug worked. There's a few problems with that. One is there's no allegation in the complaint that that information from Dr. Massey, which comes out at the very end of the class period, was shared with the defendants over the course of the class period, other than very vague references that are, by the way, all drawn from a document that's outside the record, this congressional report that the plaintiffs have now sought leave to rely upon, which only contains vague references to discussions among FDA reviewers and Biogen over the period leading up to review. That never specifies the who, what, when, where, and how of any information that was shared with Biogen that the plaintiffs now claim they must have known. So there's just a complete lack of particularity as to when and how any subgroup analysis was communicated to the defendants. But even if we were to take a step back from that, and as the plaintiffs do, just assume that that information had been communicated, the case law is very clear that these are conflicting interpretations of complex data. Biogen is not required to disclose every conflicting interpretation, and there's no evidence here that Biogen or allegation here that Biogen believed that those conflicting interpretations were the right way to look at the data. I'll give you one example that explains how this would work if this was a legitimate basis for a securities fraud litigation. We would have to decide whether Dr. Massey was right when he said, I think the right way to look at the data is to break it down by carriers and non-carriers and try to analyze whether, even though both have performed better than placebo, is it meaningful that carriers are outperforming non-carriers in some way, right? And others within the FDA said, well, you know, carriers did outperform non-carriers, but they have different genetics, so it's very possible that the different genetics are the reason for that. This is the debate that's being raised between Dr. Massey and other reviewers within the FDA. That's the debate that the plaintiffs want to make a securities class action out of, because Dr. Massey believed that that was the appropriate way to look at the data, and Biogen and other reviewers didn't. I guess the question is just whether, and you tell me what your view of this is, it would be one thing if the statements were in the vein that you're describing the statements as. I think the data is best read this way. I think this is the best way to read the study. Study indicates to me X. But the statement I'm reading is, I think what we've clearly learned is that if individuals do receive 10 milligrams per kilogram, then they do have an efficacious response. That's a pretty categorical statement. The question is whether that makes a difference, that it's couched that way. Well, first of all, I think the couching is clearly opinion, because this is an interpretation of data. I also think a lot of the words that are being used here, I think, I believe, our conclusion, our takeaway, demonstrates clearly that this is Biogen offering its own opinions about how to properly read the data. But I think the fundamental problem here is, and the plaintiffs have conceded this, and they conceded it in the district court as well, none of the facts in that sentence that your Honor just read are actually alleged to be false. This entire case is premised on the purported omission of other information, competing analyses based on, in some cases, sub-sub-subgroup data that Dr. Massey thought were informative, but that other reviewers within the FDA did not think were informative. And that is not securities fraud, right? Securities fraud is not when you have a very complex set of data, and a dissenting view comes out at the FDA that says, well, I think we should look at the data a different way. And the plaintiffs can't plead, and they plead nowhere in the complaint that anyone at Biogen honestly and genuinely believed that Dr. Massey's way of looking at the data was the right way to look at the data. That can't be securities fraud, your Honor. Let me ask you, can you give an example, again, you're arguing here there's no securities fraud, but in the hypothetical example, how would this be securities fraud involving Dr. Massey's opinion? Perhaps by affirmatively saying, nobody out there, there's not even a single dissenting voice out there, something like that would be securities fraud, or still that wouldn't be securities fraud? Well, I'm glad your Honor asked that question. In many of the cases, the company actually... I'm referring probably to the Ninth Circuit case. In many of the cases, your Honor, the company actually makes an attempt to predict the reaction of the FDA. So they'll say, we believe that it's likely that the FDA is going to approve it, or we feel very optimistic. Those are pre-approval cases, situations, correct? Those would be pre-approval cases, and then in some of those cases, it turns out, when the complaint comes in, that the FDA had told the company something in the weeks leading up to that. For example, the Ariad case, where they communicated clearly, we're not going to approve the label that you, the company, are promoting here, and the company is still out there telling investors that they're optimistic that their label is going to get approved. That is a different situation. Here, Biogen expressly declined to prognosticate, would the FDA approve this drug or not? They said, we're not going to guess what the FDA's reaction is going to be to this complicated situation where you have an original study, the prime study that is supportive, but then you have two phase three trials, one that is a failed study and one that is a successful study. And they didn't make promises or commitments to investors, which I would also respectfully submit undermines any inference of C-enter here. So what we're left with are competing interpretations of the data, and I'll just, the Arena case, the Schuenemann case that was cited earlier, that's a case where the statement was something to the effect of all animal studies completed, support approval by the FDA, when in fact one of the studies that had been completed had demonstrated cancer in rats, as I understand it. So this is not a state, a question of, do you, you know, do you analyze the numbers this way versus looking at them this way? What's the right subgroup to look at? This is a case of factual misrepresentation. All of the studies did not in fact say what the defendants said that they did. And I think that is a very important distinction in this line of cases. Thank you. Thank you, counsel. At this time, counsel for the appellants would reintroduce himself on the record. He has a three minute rebuttal. Robert cry for the appellants. Your honors, we are not seeking to hold Biogen liable merely because it chose sides in a debate over how to interpret data on which there were two possible views. The law is clear that what you cannot do is present your opinion, but then conceal the data that would support the other side's view. That's what this case is about. And so all those arguments that there was debate within the agency, Biogen was just taking its reasonable view, if Biogen had disclosed that data like it had in the past and then said, nonetheless, our opinion is. That's only going to be true if that data once disclosed would reveal that there was more than a debate to be had, right? No, it only needs to reveal that that not disclosing it was misleading. I mean, that's only going to be true is if once we look at it, it's more than just shows that the proposition that was asserted was just a debatable one. I'm still not quite sure that's right, because even if a proposition is debatable, if it looks like conclusive when you hide the full range of data, it's a completely different thing. But that's what I'm saying. It's just going to depend on whether in the end, the data that you're saying was not disclosed, shows that there's more than just a debatable thing to be had, right? In any case, we meet that standard, too, Your Honor. Why do you? It's alleged in the complaint, this is at paragraphs 157 to 159, that in Study 302, the carriers that took the higher dose did worse than the ones that took the lower dose. And that is just fundamentally inconsistent with the explanation that Biogen gave for why Study 301 failed. And that's not just something we made up in the complaint. At page 8229 of the Joint Appendix, which is Dr. Massey's report, it has that same data. And so there was data that contradicted their explanation for why Study 301 failed. I should mention, too, the District Court did actually mention all that data statement. It's in footnote 6 of page 22 of the addendum, so it wasn't lost on it. But obviously, we're giving that statement more emphasis here. And I think Your Honor can see why. I mean, that statement speaks for itself. Mr. Sandrock said in an analyst call where he knew he was speaking to the market at large, that you really need to get to the higher dose, and all our data was consistent with that. All counts, Your Honor, in the Abramson case, the Second Circuit held that the defendant was potentially liable or allowed the case to go forward because the defendant had said all the studies. Just going back a step, if I heard you right, you're saying that the point that your opponent made about the 301 study, the fact that that failed shows that they couldn't have been making the misrepresentation. You're saying that's wrong because their reason for showing the 301 failed is a reason that doesn't speak to the point you're making about how it was misleading. Is that the idea? No, it's slightly different. So Biogen gave a reason for why Study 301 failed, but it concealed the data from Study 302 that showed that that couldn't have been the reason it failed. That's the fundamental problem with their case here. It's not a problem of sub-sub-subgroups. They're the ones that injected this issue about why the study failed. They said it was because of the protocol amendments that increased the number of, or the doses that carriers got, but then they concealed that exact information about Study 302 that contradicted it. On this issue of stock buybacks and stock sales by insiders... That's all covered in the brief, and the theory that there was no conflicting information provided to Biogen's executives. The complaint at paragraphs 50 and 133 alleges the extensive meetings during this time period, but then the most damning thing is the congressional report says that Dr. Massey's group met with senior executives, including one of the name plaintiffs, Samantha Budd-Haberlin, in October 2019, but two meetings later, they got kicked out. They didn't get invited back for any other working group meetings at the FDA, and why would you do that? Why would you silence the statisticians at the FDA unless you really thought that there was a risk of misleading investors, or unless you were being reckless, blinding your eyes and just not even checking whether your explanation made sense? So, Your Honor, this case should proceed past the pleadings. Thank you.